**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

JEREMIAH MARTIN,

      Plaintiff,

v.

COLORADO DEPARTMENT OF CORRECTIONS, STATE OF COLORADO,

MATTHEW WINDEN,
In his individual capacity,

AARON ASHENFELTER,
In his individual capacity,

JUSTIN SMITH,
In his individual capacity,

NATHAN LARIMORE,
In his individual capacity, and

MARK MYERS,
In his individual capacity,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

      Plaintiff, Jeremiah Martin ("Mr. Martin"), by and through counsel, Leventhal Lewis Kuhn Taylor Swan PC, submits this Complaint and Jury Demand against the Defendants, State of Colorado, Colorado Department of Corrections ("CDOC"), Matthew Winden, Aaron Ashenfelter, Justin Smith, Nathan Larimore, and Mark Myers, and alleges:

## INTRODUCTION

1.    This is an employment harassment action by employee and Correctional Officer Jeremiah Martin against his employer, the State of Colorado, Department of Corrections, and other persons in their individual capacities, seeking damages to redress violations of Plaintiff's rights.

## PARTIES

2.    Plaintiff is an individual residing in Pueblo, Colorado. He is an employee of the Colorado Department of Corrections.

3.    Defendant State of Colorado, Colorado Department of Corrections, is a political agency, a Department of the Executive Branch, of the State. Defendant at all relevant times was Plaintiff's employer within the meaning of relevant statutes. Defendant's central office is located at 1250 Academy Park Loop, Colorado Springs, Colorado, 80910.

4.    Defendant Matthew Winden is an employee at the level of Warden with the Colorado Department of Corrections, at the Centennial Correctional Facility. He lives in the state of Colorado at the relevant times.

5.    Defendant Aaron Mark Ashenfelter is or was an employee at the level of Lieutenant with the Colorado Department of Corrections. He lived in the state of Colorado at the relevant times.

6.    Defendant Justin Smith is or was an employee at the level of Lieutenant with the Colorado Department of Corrections. He lived in the state of Colorado at the relevant times.

7.    Defendant Nathan Larimore is or was an employee at the level of Correctional Officer I with the Colorado Department of Corrections. He lived in the state of Colorado at the

relevant times.

8. Defendant Mark Myers is an employee of the Department of Corrections as a Criminal Investigator. He lived in the state of Colorado at the relevant times.

## JURISDICTION AND VENUE

9. This Court has original federal question jurisdiction under 28 U.S.C. § 1331. Mr. Martin brings this action to recover damages caused by DOC's violations of 42 U.S.C. § 1981.

10. This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the unlawful conduct complained of herein occurred in, and the relevant records and witnesses are located in, the District of Colorado.

## GENERAL ALLEGATIONS

12. Plaintiff reincorporates by reference all previous paragraphs herein.

13. Mr. Martin is an employee of the Colorado Department of Corrections ("Department" or "CDOC").

14. Mr. Martin works as a Correctional Officer I.

15. Mr. Martin began employment with the CDOC on approximately August 7, 2019.

16. Mr. Martin is a Hispanic/latino male.

17. Pursuant to state law and rules, the Department evaluates its employees' performance annually and at mid-year.

18. The Department rates its employees on a three-level scale, 1 being unsatisfactory

performance, 2 being performance which meets or exceeds expectations, and 3 being outstanding performance.

19.     Mr. Martin performed his duties well, and, prior to the actions complained of herein, received performance reviews which rated him a Level II or above employee.

20.     In or around January 2021, Mr. Martin was working at Centennial Correctional Facility.

21.     In or around this month, Mr. Martin was assigned a new supervisor, Lieutenant Aaron Ashenfelter.

22.     Lt. Ashenfelter during the month of January 2021 began harassing Mr. Martin in various ways.

23.     Lt. Ashenfelter would single Mr. Martin out by placing him only on duty in the Control Room and refuse to allow him to work the floor, while stating, "I wonder what asshole did that?"

24.     Working in the Control Room was considered by employees to be a negative and undesirable assignment.

25.     For that reason, employees would take turns so that no employee would have to serve in the control room more than once per week.

26.     Lt. Ashenfelter would come to Mr. Martin's unit and tell Mr. Martin that he would be fired and/or that he would "have him gone" or "have his job," sometimes in front of co-workers.

27.     These comments were designed to belittle Mr. Martin in front of his peers and encourage his peers to harass him as well, or minimally, not support him.

28.     Lt. Ashenfelter did not treat white/Caucasian employees in this manner.

29.     Lt. Ashenfelter did not direct demeaning or belittling language towards white/Caucasian employees.

30.     Mr. Martin complained about Lt. Ashenfelter's conduct, but no action was taken about Mr. Martin's complaint.

31.     On the first week of February, believed to be February 3rd, 2021, Mr. Martin was handcuffed to the fire suppression system in B-Unit.

32.     He was left there for over an hour without assistance and in a vulnerable position where offenders could reach him and potentially harm him.

33.     Mr. Martin complained of being handcuffed as a wholly inappropriate, dangerous and unprofessional act.

34.     No action was taken about Mr. Martin's complaint.

35.     On February 7, 2021, Mr. Martin was assigned to B-Unit.

36.     At this time he was with an offender, "B," while a nurse performed a diabetic test in Dayhall 1.

37.     The nurse left the dayhall to call a medical provider for an order.

38.     At this time the control Officer Nathan Larimore walked over and removed his 37 mm arm.

39.     Larimore then pointed the 37 mm through an opening in the glass and pointed it at Mr. Martin.

40.     Mr. Martin was shocked and feared for his safety.

41.     This was a direct threat on Mr. Martin.

42.     Larimore laughed and eventually withdrew his weapon.

43.     An incident report was submitted by Mr. Martin complaining of Mr. Larimore's conduct, but no action was taken in response to the complaint.

44.     Mr. Larimore's father is a Major for the Department.

45.     Although there was camera footage of the incident and an incident report filed, the footage went missing or was deleted.

46.     On or about February 17, 2021, Mr. Martin was again handcuffed by Lt. Ashenfelter.

47.     This time Lt. Ashenfelter called Mr. Martin's sergeant and instructed the sergeant to send Mr. Martin to Ashenfelter's office.

48.     Upon arrival, Mr. Martin was handcuffed to a set of lockers and was left there for over two hours.

49.     All of his equipment and his radio were taken. He was again vulnerable to inmates nearby.

50.     During both of the incidents of handcuffing on February 3 and 17, 2021, officers nearby were specifically ordered by Lt. Ashenfelter to not assist Mr. Martin and to leave him there.

51.     Mr. Martin complained about this second incident of being handcuffed, but no action was taken.

52.     Mr. Martin documented each of these incidents in a journal.

53.     Several weeks later, Lieutenant Justin Smith learned that Mr. Martin was keeping a journal of these incidents.

54.     Lt. Smith came into the unit office and opened Mr. Martin's lunch box where he kept the journal and began reading it.

55.     Lt. Smith looked at Mr. Martin and stated, "oh this isn't going to happen."

56.     He then ripped the pages out of the book and took the shredded pages with him.

57.     Mr. Martin therefore had his contemporaneous evidence, his notes, destroyed by Smith.

58.     During the final week of February Mr. Martin was working on a computer.

59.     Lieutenant Ashenfelter came into the unit and asked Lt Smith to give him a taser.

60.     Once Mr. Ashenfelter had a taser, he proceeded to tase Mr. Martin in the back while he was working on the computer.

61.     Mr. Martin again complained about the conduct of Mr. Ashenfelter tasing him, but no action was taken in response to his complaint.

62.     Mr. Martin timely and repeatedly reported these incidents to his chain of command, and in particular Warden Matthew Winden.

63.     Winden has dismissed Mr. Martin's complaints as unimportant and has chosen repeatedly to not investigate the complaints.

64.     Winden has had communications with members of the Office of Investigator General of CDOC about Mr. Martin.

65.     By information and belief, Winden has asked the Office of Investigator General to

investigate Mr. Martin.

66.     After Mr. Martin reported these incidents, he was force moved (an involuntary move) to a different unit without explanation.

67.     Whenever Mr. Martin would attempt to speak to Warden Matthew Winden, he was ignored or told that Mr. Winden lost the paperwork.

68.     In this new unit, in the middle of March, Mr. Martin fell down a set of stairs which were not cleared of debris and sustained broken ribs and a possible rotor cuff tear.

69.     Mr. Martin appropriately and timely filed a worker's compensation claim for this incident.

70.     While Mr. Martin was prescribed pain relievers and muscle relaxers by his doctor, Warden Matt Winden required that he return to work against the doctor's orders and while on muscle relaxers.

71.     Mr. Martin explained that he had a doctor's note and was dizzy and drowsy from the muscle relaxers but Winden still insisted that he return to work.

72.     Once Mr. Martin returned to work, Lt. Ashenfelter immediately harassed Mr. Martin, asking him why he took so long to arrive. Lt. Ashenfelter stated that Mr. Martin was "lazy," which is a stereotype often attributed to persons of Hispanic descent.

73.     Lt. Ashenfelter and Lt. Smith stated to Mr. Martin that his fall was not legitimate.

74.     Lt. Smith also implied that Mr. Martin was lazy.

75.     On April 1, 2021, Mr. Martin received an email that he was required complete a mandatory training to stay in compliance with CDOC rules, but his supervisors assigned him to

to Control Room shifts every day so that he could not complete the required training. Mr. Martin had no choice but to complete the training at home online because he was not allowed to leave to econtrol room at any time.

76.     Subsequent to these events, Mr. Martin was noticed for a pre-disciplinary "Rule 6-10" meeting, set for March 24, 2021, and then reset for April 15, 2021, by Warden Winden.

77.     The notice in March indicated that Mr. Martin was being investigated for discipline due to "Code of Conduct violation" but failed to specify any factual basis for this claim.

78.     The notice for the April meeting stated that he was being investigated for "failing to remain alert" which was pretext by the Warden to retaliate against Mr. Martin.

79.     Mr. Martin by information and belief understands officer Jamie Shupenko was directed to make a report against Mr. Martin that he "must be" sleeping because he did not open a gate for her quickly enough.

80.     Mr. Martin had known Officer Shupenko had disliked him and yet he was involuntarily assigned to her unit. Shupenko made comments that Mr. Martin would get fired once he was assigned to her unit.

81.     Offenders began disobeying Mr. Martin and treating him with disrespect, because they observed Mr. Martin harassed by Ashenfelter and others.

82.     Mr. Martin subsequent to these events, and on but not limited to April 15, 2021, filed numerous transfer requests which Warden Winden denied and in some cases claimed "disappeared."

83.     On dates, including but not limited to April 14, 2021, Mr. Martin submitted complaints of unlawful harassment, discrimination, and workplace violence. Nothing was done to remedy his complaints.

84.     Mr. Martin has been accused of not having training completed, or not having the needed training to obtain promotions or transfers, yet each time he has submitted a request for training in Pistols, Armed Transport, or Tasers, he has been denied without explanation.

85.     At the end of March or early April, Mr. Martin was involuntarily transferred to Colorado State Penitentiary (CSP) despite his specific request to not work at that facility because it was the sister facility to Centennial. Ashenfelter, Smith, Larimore, and Shupenko all have connections, family members, and/or friends at CSP.

86.     While at CSP Mr. Martin was told to work outside of his worker's compensation doctor's ordered restrictions, placing his health at risk.

87.     While at CSP Mr. Martin was told that he needed to obtain required training or he would be out of compliance. However when he asked for time to complete his training he was denied and told to complete the training while at home.

88.     Mr. Martin has been left with the threat of discipline up to termination from the Rule 6-10 process, without any resolution.

89.     Further, he was interviewed by the Office of Investigator General about his claims on May 13, 2021, but has received no information or remedy.

90.     Mr. Martin has emailed the Chief of Human Resources, Rick Thompkins, but no action or assistance was taken.

91.     From August of 2021 to present, Mr. Martin has been involuntarily force transferred to five or six different facilities and in different cities.

92.     Mr. Martin has periodically been threatened with additional Rule 6-10 pre-disciplinary meetings, but they are either canceled or Mr. Martin receives no response from the Department after the meetings take place.

93.     Mr. Martin requested that the Department pursue criminal charges against Mr. Ashenfelter.

94.     The District Attorney filed charges against Mr. Ashenfelter in April of 2021, but in December of 2021, Mr. Martin was informed that the case against Mr. Ashenfelter was dropped or dismissed.

95.     By information and belief, Plaintiff's criminal charges against Ashenfelter were not pursued because the District Attorney did not have the full cooperation or agreement of testimony from the CDOC's Office of Investigator General.

96.     Mr. Martin, through counsel, filed a Governmental Immunity Notice within 182 days of the original harassment and handcuffing of February 2021.

97.     The Department was therefore on notice of possible claims by Mr. Martin.

98.     The Department was also aware, via the Governmental Immunity Notice, that Mr. Martin's claims included possible assault, battery, false imprisonment, or other tortious conduct with a possible statute of limitations of one year.

99.     The one year statute of limitations would be triggered beginning upon the first adverse actions against Mr. Martin.

100.    The Department therefore was aware that Mr. Martin was likely to bring claims by the end of January 2022 or early February 2022.

101.    On January 7, 2022, Mr. Martin was contacted by the Department of Corrections' Office of Inspector General Criminal Investigator Mark Myers.

102.    Mr. Myers had an officer call Mr. Martin to the Shift Commander's office and told to turn in his equipment.

103.    Mr. Myers then had Mr. Martin report to a smaller side room and told him to sit.

104.    Mr. Myers was present with another investigator, believed to be Chris Barr. No one else was present.

105.    Mr. Myers had a recording device present and the light on the device was red, indicating it was turned on.

106.    Mr. Martin asked if he was under investigation for something.

107.    Mr. Myers stated that he was.

108.    At this point Mr. Martin stated that if this was a formal investigation and being recorded, he would like to have his lawyer or a representative present.

109.    Mr. Myers replied that Mr. Martin would not be allowed any representative.

110.    Mr. Martin stated that he was not comfortable continuing at that point.

111.    CDOC policy specifically allows for a representative to be present for formal investigative meetings.

112.    Mr. Myers then stated to Mr. Martin that if he left the room and didn't give a statement, he would issue a warrant for a class 5 felony for embezzlement of government

property against Mr. Martin.

113.    Mr. Martin again stated that he wanted a representative or lawyer present immediately.

114.    Mr. Myers again stated that if Mr. Martin attempted to leave the room, he would immediately issue the warrant for Mr. Martin's arrest.

115.    The other investigator remained silent or stated very little.

116.    Mr. Martin left the room and immediately called his attorney.

117.    Mr. Martin was not arrested because he did not commit a felony.

118.    Mr. Martin and his attorney later contacted Mr. Myers about the incident.

119.    Mr. Myers claimed to Mr. Martin that the audio recording of the meeting was not saved or lost.

120.    Mr. Myers' supervisor, Danny Lake, later stated to Mr. Martin that he was not aware of any investigation into Mr. Martin.

121.    Mr. Myers demanded that Mr. Martin appear for another meeting, which was scheduled to be with counsel.

122.    Mr. Myers at the second meeting refused to give Mr. Martin either a Garrity Warning or a Miranda Warning, though he stated that Mr. Martin was under criminal investigation.

123.    Mr. Myers again at this second meeting threatened Mr. Martin with immediate criminal charges or a summons if he did not comply with him and answer his questions.

124.    Mr. Myers alleged that Mr. Martin had "stolen" from the Department because

certain time entries for Mr. Martin's work time did not "match."

125.   Mr. Martin was given no other information but was told that he was required to account for his complete whereabouts for every day of November 2021.

126.   Based on the seriousness (and falseness) of the allegations, Mr. Martin elected to invoke his 5th Amendment right to not answer the investigator's questions.

127.   Counsel for Mr. Martin asked Mr. Myers who had directed that he investigate Mr. Martin. Mr. Myers refused to answer this question.

128.   As of Monday, January 31, 2022, the filing of this Complaint, Mr. Martin has not been charged with any crime or issued a summons.

129.   Regardless, these acts have caused Mr. Martin extreme emotional distress.

130.   Mr. Martin has a family and children and has never been charged with or convicted of any crime, other than possible minor traffic infractions.

131.   Mr. Martin has had to retain the services of a criminal defense attorney, an employment law attorney, and the services of the state employee's union grievance representative.

132.   Mr. Martin has expended significant financial resources to defend himself throughout these events.

133.   Mr. Martin has had to see a therapist for treatment of severe anxiety and emotional distress from these events.

134.   Mr. Martin continues to be targeted and threatened with adverse actions by the Department and certain employees.

135.     Mr. Martin has lost wages from missed shifts due to recovery from his injuries and his attendance at criminal proceedings against Mr. Ashenfelter and others.

136.     Mr. Martin has suffered from the ongoing threat of loss of employment.

137.     Mr. Martin has suffered from the ongoing environment of hostility.

138.     Mr. Martin has been prevented from any opportunities from promotion due to the incidents at bar.

139.     Mr. Martin has been prevented from transferring to a facility where he can be free of retaliation.

## CLAIM 1

(February 3, 2021 Assault against Defendant Ashenfelter)

140.     Plaintiff re-alleges and incorporates herein all paragraphs above.

141.     Defendant Ashenfelter intended to cause an offensive or harmful physical contact with Plaintiff or intended to place Plaintiff in apprehension of such contact.

142.     Ashenfelter intended to cause the harmful or offensive physical contact with Plaintiff or place Plaintiff in apprehension of such contact by his act of handcuffing Plaintiff on or about February 3, 2021.

143.     Defendant Ashenfelter placed Plaintiff in apprehension of immediate physical contact.

144.     Ashenfelter placed Plaintiff in apprehension of immediate physical contact by his movement towards Plaintiff and grabbing of Plaintiff's hands prior to handcuffing them.

145.     The contact appeared to be harmful or offensive.

146.   Defendant Ashenfelter's actions were willful, wanton, and intentional.

147.   Defendant Ashenfelter's actions were outside the scope of his employment duties.

148.   Defendant Ashenfelter's actions were with knowledge that his acts would violate Plaintiff's rights.

## CLAIM 2

(February 3, 2021 Battery against Defendant Ashenfelter)

149.   Plaintiff re-alleges and incorporates all paragraphs above by reference.

150.   Defendant Ashenfelter's act resulted in physical contact with Plaintiff.

151.   Defendant Ashenfelter's actions of handcuffing Plaintiff resulted in unwanted physical contact with Plaintiff.

152.   Defendant Ashenfelter intended to make harmful or offensive physical contact with Plaintiff, or knew that he would probably make such contact.

153.   The contact was harmful or offensive.

154.   The contact was harmful or offensive because Mr. Martin was restricted in his movements and ability to defend himself and because the restriction lasted for over an hour and in an area where offenders could have access to him.

155.   Defendant Ashenfelter's actions were willful, wanton, and intentional.

156.   Defendant Ashenfelter's actions were outside the scope of his employment duties.

157.   Defendant Ashenfelter's actions were with knowledge that his acts would violate Plaintiff's rights.

## CLAIM 3

(February 3, 2021 False Imprisonment against Defendant Ashenfelter)

158.    Plaintiff re-alleges and re-incorporates all paragraphs above by reference.

159.    Defendant Ashenfelter intended to restrict Plaintiff's freedom of movement.

160.    Defendant Ashenfelter, directly or indirectly, restricted Plaintiff's freedom of movement for a period of time.

161.    Defendant Ashenfelter did so by handcuffing Plaintiff on February 3, 2022.

162.    Plaintiff was aware that his freedom of movement was restricted.

163.    Defendant Ashenfelter's actions were willful, wanton, and intentional.

164.    Defendant Ashenfelter's actions were outside the scope of his employment duties.

165.    Defendant Ashenfelter's actions were with knowledge that his acts would violate Plaintiff's rights.

## CLAIM 4

(February 7, 2021 Assault against Defendant Larimore)

166.    Plaintiff re-alleges and incorporates herein all paragraphs above.

167.    Defendant Larimore intended to cause an offensive or harmful physical contact with Plaintiff or intended to place Plaintiff in apprehension of such contact.

168.    Defendant Larimore intended to cause the harmful or offensive physical contact with Plaintiff or place Plaintiff in apprehension of such contact by his act of directing his 37 mm weapon at Plaintiff on February 7, 2021.

169.    Defendant Larimore placed Plaintiff in apprehension of immediate physical contact.

170.    Defendant Larimore placed Plaintiff in apprehension of immediate physical contact by his directing his gun towards Plaintiff and aiming it at him.

171.    The contact appeared to be harmful or offensive.

172.    Defendant Larimore's actions were willful, wanton, and intentional.

173.    Defendant Larimore's actions were outside the scope of his employment duties.

174.    Defendant Larimore's actions were with knowledge that his acts would violate Plaintiff's rights.

## CLAIM 5

(February 17, 2021 Assault against Defendant Ashenfelter)

175.    Plaintiff re-alleges and re-incorporates all paragraphs above by reference.

176.    Defendant Ashenfelter engaged in the same conduct identified in Claim One a second time, on February 17, 2021.

177.    Plaintiff was handcuffed a second time.

178.    Plaintiff was in apprehension of physical contact.

179.    Defendant Ashenfelter's actions were willful, wanton, and intentional.

180.    Defendant Ashenfelter's actions were outside the scope of his employment duties.

181.    Defendant Ashenfelter's actions were with knowledge that his acts would violate Plaintiff's rights.

## CLAIM 6

(February 17, 2021 Battery against Defendant Ashenfelter)

182.    Plaintiff re-alleges and re-incorporates all paragraphs above by reference.

183.     Defendant Ashenfelter intended to cause harmful or offensive contact with Plaintiff, or intended to place the plaintiff in apprehension of harmful or offensive contact.

184.     Defendant Ashenfelter did so by placing Plaintiff in handcuffs on or about February 17, 2021.

185.     A harmful or offensive contact with the plaintiff actually occurred, either directly or indirectly.

186.     Plaintiff was in fact handcuffed against his will on February 17, 2021.

187.     Defendant Ashenfelter's actions were willful, wanton, and intentional.

188.     Defendant Ashenfelter's actions were outside the scope of his employment duties.

189.     Defendant Ashenfelter's actions were with knowledge that his acts would violate Plaintiff's rights.

## CLAIM 7

(February 17, 2021 False Imprisonment against Defendant Ashenfelter)

190.     Plaintiff re-alleges and re-incorporates all paragraphs above by reference.

191.     Defendant intentionally restricted the plaintiff's freedom of movement.

192.     Defendant did so by his handcuffing of Plaintiff on February 17, 2021.

193.     Plaintiff's freedom of movement was restricted for a period of time, either directly or indirectly by Defendant.

194.     Plaintiff's freedom of movement was restricted for over two hours by Defendant's handcuffing of him.

195.     Plaintiff was aware that his or her freedom of movement was restricted.

196.    Defendant Ashenfelter's actions were willful, wanton, and intentional.

197.    Defendant Ashenfelter's actions were outside the scope of his employment duties.

198.    Defendant Ashenfelter's actions were with knowledge that his acts would violate Plaintiff's rights.

## CLAIM 8

### (End of February Assault against Defendant Ashenfelter)

199.    Plaintiff re-alleges and re-incorporates all paragraphs above by reference.

200.    Defendant Ashenfelter intended to cause an offensive or harmful physical contact with Plaintiff or intended to place Plaintiff in apprehension of such contact.

201.    Ashenfelter intended to cause the harmful or offensive physical contact with Plaintiff or place Plaintiff in apprehension of such contact by his act of tasing Plaintiff at the end of February 2021.

202.    Defendant Ashenfelter placed Plaintiff in apprehension of immediate physical contact.

203.    Ashenfelter placed Plaintiff in apprehension of immediate physical contact by his movement towards Plaintiff with the taser in hand.

204.    The contact appeared to be and was harmful or offensive.

205.    Defendant Ashenfelter's actions were willful, wanton, and intentional.

206.    Defendant Ashenfelter's actions were outside the scope of his employment duties.

207.    Defendant Ashenfelter's actions were with knowledge that his acts would violate Plaintiff's rights.

## CLAIM 9

### (End of February Battery against Defendant Ashenfelter)

208. Plaintiff re-alleges and incorporates all paragraphs above by reference.

209. Defendant Ashenfelter's act resulted in physical contact with Plaintiff.

210. Defendant Ashenfelter's actions of tasing Plaintiff resulted in unwanted physical contact with Plaintiff.

211. Defendant Ashenfelter intended to make harmful or offensive physical contact with Plaintiff, or knew that he would probably make such contact.

212. The contact was harmful or offensive.

213. The contact was harmful or offensive because Mr. Martin was in fact tased by Mr. Ashenfelter.

214. Defendant Ashenfelter's actions were willful, wanton, and intentional.

215. Defendant Ashenfelter's actions were outside the scope of his employment duties.

216. Defendant Ashenfelter's actions were with knowledge that his acts would violate Plaintiff's rights.

## CLAIM 11

### (Conspiracy against all individual Defendants)

217. Plaintiff re-alleges and incorporates all paragraphs above by reference.

218.     Two or more persons, namely, the individual Defendants Ashenfelter, Smith, Larimore, Winden, and Myers, acted with an object to be accomplished, namely, the goal of harassing, targeting, and forcing from employment the Plaintiff.

219.     The persons involved were in agreement on the object or course of action.

220.     They committed intentional, unlawful overt acts.

221.     The act proximately resulted in damages to the Plaintiff.

222.     Defendants further acted willfully and wantonly and with knowledge that their actions would violate Plaintiff's rights.

## CLAIM 12

### (Abuse of Process against Defendant Myers)

223.     Plaintiff re-alleges and incorporates all paragraphs above by reference.

224.     Defendant Myers had an ulterior motive in the use of his criminal proceedings.

225.     Defendant Myers willfully acted in the criminal investigation process in a manner not proper, by his threats of baseless criminal charges, his refusal to allow Plaintiff representation, and his improper distraction from Plaintiff's property interest in his employment and lawful engagement of a civil action.

226.     The Defendant's criminal investigation lacked a reasonable factual basis or cognizable basis in la and was improper in its purpose.

227.     Plaintiff was damaged by the abuse of process.

## CLAIM 13

### (Intentional Infliction of Emotional Distress against all Defendants)

228.   Defendants engaged in extreme and outrageous conduct in the collective, hostile treatment of Plaintiff.

229.   The Defendants engaged in that conduct recklessly or with the intent to cause the plaintiff severe emotional distress.

230.   Plaintiff suffered severe emotional distress as a result.

231.   Defendants' actions were willful, wanton, and intentional.

232.   Defendants' actions were outside the scope of his employment duties.

233.   Defendants' actions were with knowledge that his acts would violate Plaintiff's rights.

## CLAIM 14

(Violation of 42 U.S.C. § 1981 against all Defendants through § 1983)

234.   Plaintiff re-alleges and incorporates all paragraphs above by reference.

235.   Plaintiff was harassed by Defendants because of his race (Hispanic).

236.   Plaintiff's harassment included, but is not limited, the following actions: wrongful handcuffings, tasings, threat of physical injury from a firearm, derogatory comments, allegations of laziness, singling out of Plaintiff for negative job assignments, favorable treatment to white employees, destruction of Plaintiff's journal, denial of Plaintiff's transfer requests, refusals to investigate Plaintiff's claims, refusal to assist in Plaintiff's criminal charges against Defendant Ashenfelter, threats of Rule 6-10 disciplinary hearings, and continued targeting through investigations and threats of criminal charges against him.

237.   Defendants' conduct was not welcomed by Plaintiff.

238.    Plaintiff's race was the reason for Defendants' conduct.

239.    The conduct was so severe or pervasive that a reasonable person in Plaintiff's position would find the work environment to be hostile or abusive.

240.    Plaintiff believed his work environment was hostile or abusive as a result of the named Defendants' conduct.

## CLAIM 16

(Injunctive Relief against Defendants Department of Colorado and Warden Matthew Winden)

241.    Plaintiff re-alleges and incorporates all paragraphs above by reference.

242.    The above claims seek money damages in addition to other relief.

243.    Plaintiff separately seeks injunctive relief for Defendants Department of Corrections and Matthew Winden to take the following actions.

244.    Transfer to a facility mutually acceptable to Plaintiff and Defendant Department of Corrections.

245.    Injunction from further transfers of Plaintiff.

246.    Injunction from further harassment or retaliation against Plaintiff.

247.    Injunction from further improper OIG investigations of Plaintiff.

## PRAYER FOR RELIEF

Plaintiff prays that this Court enter judgment for the Plaintiff and award Plaintiff damages as established by the fact finder:

Economic damages, including without limitation any lost back wages and benefits incurred incident to the adverse actions described herein;

Compensatory damages, including without limitation, special damages and damages for loss of reputation, loss of opportunity for professional growth, loss of opportunity for immediate and future promotion; emotional distress, pain and suffering, and mental anguish;

Injunctive and/or declaratory relief;

An award of reasonable attorneys' fees and costs;

Pre-judgment and post-judgment interest as provided for under the law from the earliest possible date and at the highest lawful rate; and

Such other relief as the Court deems just and proper.

**PLAINTIFF REQUESTS A TRIAL BY JURY.**

Respectfully submitted this 31st day of January, 2022.

*/s/ Casey J. Leier*
Casey J. Leier
Leventhal | Lewis
Kuhn Taylor Swan PC
Ptarmigan at Cherry Creek
3773 Cherry Creek N. Dr., Ste. 710
Denver, CO 80209
Telephone: (719) 694-3000
Email:        cleier@ll.law
*Attorney for Plaintiff*

Plaintiff's Address:
3102 Royal Avenue
Pueblo, CO 81005